In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-06-015 CV


____________________



IN THE INTEREST OF J.V.G.






On Appeal from the 221st District Court


Montgomery County, Texas


Trial Cause No. 98-12-04437-CV






MEMORANDUM OPINION


 This is an appeal from an order in a suit affecting the parent-child relationship. 
Petitioner, Vilma Estela Stibolt ("Vilma"), sought to modify her divorce decree, which was
final in 2000, apparently to provide her greater custodial access to her child, J.V.G., as
appellant/respondent, Constantino Gaeta ("Constantino"), was initially named sole managing
conservator of J.V.G. Trial counsel for Vilma was appellee, Laura D. Dale, while
Constantino was represented by appellant, M. Elena Navarro. A jury trial resulted in both
Constantino and Vilma being named joint managing conservators, with Constantino retaining
the right to designate the primary residence of J.V.G. Several months later, the trial court
ruled on two remaining issues: attorney's fees and sanctions. Specifically, the trial court
awarded Vilma attorney's fees in the amount of $40,000, with interest at 5%. The trial court
also found certain pretrial conduct by Constantino's attorney, Ms. Navarro, necessitated the
awarding of sanctions to Vilma's counsel, Ms. Dale, in the amount of $5,000, with interest
at 10%. Only Constantino and Ms. Navarro have perfected appeal. Constantino has not filed
a brief or given reasonable explanation for such failure, nor attempted to pursue his appeal
any further. See Tex. R. App. P. 38.8(a)(1); Elizondo v. City of San Antonio, 975 S.W.2d 61,
63 (Tex. App.--San Antonio 1998, no pet.). Ms. Navarro has raised six issues for our
consideration limited to the propriety of the trial court's imposition of sanctions and the
award to Ms. Dale. 

 We begin with Ms. Navarro's sixth issue as it raises concerns of lack of trial court
jurisdiction to enter the sanctions order and procedural default on the part of Ms. Dale in
relation to the timing of the trial court's sanctions ruling. Initially, Ms. Navarro contends that
because the May 17, 2005, modification order was a final judgment, the sanctions order,
signed November 23, 2005, is void as being outside the period of the trial court's plenary
powers. However, appearing within the modification order is the following language: "IT
IS ORDERED that the attorney's fees and sanctions in this matter have been reserved and
will be heard at a later date to be determined by the Court." An order or judgment is not final
for purposes of appeal unless it actually disposes of every pending claim and party or unless
it clearly and unequivocally states that it finally disposes of all claims and all parties. See
Lehmann v. Har-Con Corp., 39 S.W.3d 191, 205 (Tex. 2001). Although the order also
contains language commonly referred to as a "Mother Hubbard Clause," the trial court
clearly intended for the order not to be final for purposes of appeal by its explicit reservation
of "attorney's fees and sanctions in this matter." See id. at 200 ("The intent to finally dispose
of the case must be unequivocally expressed in the words of the order itself.").

 Further support for the interlocutory status of the May 17, 2005, modification order
appears when we examine the record before us, as Lehmann instructs. See id. at 205-06 ("To
determine whether an order disposes of all pending claims and parties, it may of course be
necessary for the appellate court to look to the record in the case."). During the September
8, 2005, sanctions hearing, counsel for Ms. Navarro argued that because all of Ms. Navarro's
conduct in question took place prior to trial, Ms. Dale waived any complaint for sanctions
by failing to secure a ruling prior to commencement of the jury trial, citing as authority
Remington Arms Company, Inc. v. Caldwell, 850 S.W.2d 167 (Tex. 1993). Ms. Dale
responded by pointing out the explicit reservation of the attorney's fees and sanctions issues
by the court in the May 17, 2005 order. Also recalling the pretrial circumstances regarding
the sanctions issue, the trial court responded with the following: 

 THE COURT: Because that, in fact, was the case. Because they
wanted it heard and I thought the best thing to do was get the case over with
and then we'll deal with the lawyers because the parties needed to be dealt
with. . . . But I'm thinking that it's kind of like in a family law case you -- any
sanctions regarding pretrial orders are waived because they are superceded by
the final order. However, this was discussed at length and that I said I had --
Ms. Dale asked for a hearing and I did not allow her to have a hearing because
I said I was going to hear it later. 


 [Counsel for Ms. Navarro]: Judge, if she had filed - 


 THE COURT: So, for that reason -- so for that reason I am going to
deny your request to not hear it. So, we are going to hear it. 


 The possibility of seeking sanctions against Ms. Navarro was raised well before the
start of the jury trial in May with the February 25, 2005, filing of Ms. Dale's motion to
depose Ms. Navarro regarding her failure to appear at a scheduled mediation, a pre-trial
conference and, a previous scheduled trial date. 

 We find the facts and circumstances in the instant case distinguishable from the
particular holding announced in Remington Arms, and relied upon by Ms. Navarro. 
Remington Arms involved whether post-trial "death penalty" sanctions for pretrial discovery
abuses were proper. See Remington Arms, 850 S.W.2d at 170. The Supreme Court
determined "that the failure to obtain a pretrial ruling on discovery disputes that exist before
commencement of trial constitutes a waiver of any claim for sanctions based on that
conduct." Id. "Waiver is defined as 'an intentional relinquishment of a known right or
intentional conduct inconsistent with claiming that right.'" Jernigan v. Langley, 111 S.W.3d
153, 156 (Tex. 2003). Since the trial court acknowledged that Ms. Dale requested the
sanctions matter be heard but the court, in its discretion pursuant to Tex. R. Civ. P. 174,
ordered a separate trial regarding attorney's fees and sanctions, we decline to find any waiver
of any claim for sanctions. As has been observed, "[i]nterrupting the proceedings on the
merits to conduct sanctions hearings may serve only to reward a party seeking delay." See
Chambers v. NASCO, Inc., 501 U.S. 32, 56, 111 S.Ct. 2123, 2139, 115 L.Ed.2d 27 (1991).

 As the trial court explicitly reserved the issues of attorney's fees and sanctions in the
May 17, 2005, modification order, no final, appealable judgment was entered until the
sanctions order was signed on November 23, 2005. (1) "While we agree that a judgment does
not have to resolve pending sanctions issues to be final, that principle does not control this
case. Even if a sanctions order is not required to be included in a final judgment, it may be
included there." Lane Bank Equip. Co. v. Smith S. Equip., Inc., 10 S.W.3d 308, 312 (Tex.
2000). Therefore, the trial court retained jurisdiction to enter the sanctions order when it did
and issue six is overruled.

 Under her fourth issue, Ms. Navarro would have us hold the sanctions order reversible
because the trial court "failed to make specific findings that anything [Ms. Navarro] did
significantly interfered with the core functions of the trial court." In reviewing an order
imposing sanctions, appellate courts are not bound by a trial court's findings of fact and
conclusions of law; rather, reviewing courts must independently review the entire record to
determine whether abuse of discretion has occurred. See American Flood Research, 192
S.W.3d at 583 (citing Chrysler Corp. v. Blackmon, 841 S.W.2d 844, 852 (Tex. 1992)). 
Indeed, any "findings of fact" by a trial court made in support of its sanctions order are not
to be treated on appeal as findings made under Tex. R. Civ. P. 296, which usually are
reviewed for legal and factual sufficiency. See Mills v. Ghilain, 68 S.W.3d 141, 145 (Tex.
App.--Corpus Christi 2001, no pet.) (citing IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp., 938
S.W.2d 440, 442 (Tex. 1997)). Rather, findings made by the trial court following imposition
of sanctions are used only to assist the reviewing court in determining whether an abuse of
discretion has occurred. Mills, 68 S.W.3d at 145. As previously noted, we independently
review the entire record in making this determination. See Blackmon, 841 S.W.2d at 852.

 In support of its sanctions order rendered against Ms. Navarro, the trial court made
the following findings: 

 A. M. Elena Navarro, unilaterally cancelled mediation without notice to
Petitioner or to this Court causing expense to Petitioner who appeared at
mediation.


 B. M. Elena Navarro failed to appear at the preferentially set Docket Call with
all required documents as ordered by this Court.


 C. M. Elena Navarro, counsel for Respondent, following a denial of her
Motion for Continuance one week before jury trial, failed to appear on the date
of trial as ordered by this Court. She alleged her father was critically ill. It
later was revealed he had checked out of a hospital some three days before
trial.


 D. M. Elena Navarro failed to contact the court to reschedule the trial setting
immediately on returning from the visit with [her] father as directed by this
Court.


 E. M. Elena Navarro has engaged in a pattern of dilatory trial behavior
preventing this matter from coming before this Court in a timely and cost
effective manner.


 We have previously observed that certain statutory and code provisions in Texas
permit a trial court to issue sanctions upon proof of certain acts or omissions engaged in by
a party to litigation. See In the Interest of A.C.J., a Child, 146 S.W.3d 323, 326 (Tex. App.-
-Beaumont 2004, no pet.) Ms. Dale's sanctions allegations, however, did not involve
frivolous pleadings or discovery abuse, nor was the trial court's sanctions order based upon
such findings. The source of a trial court's authority to impose sanctions upon counsel
comes from recognizing that courts possess inherent power to discipline an attorney's
behavior. See In re Bennett, 960 S.W.2d 35, 40 (Tex. 1997) (orig. proceeding). Indeed, a
court has the inherent power to impose sanctions on its own motion under appropriate
circumstances. Id. In Bennett, the Court acknowledged its earlier observation that a court
possesses inherent power "'which it may call upon to aid in the exercise of its jurisdiction,
in the administration of justice, and in the preservation of its independence and integrity.'" 
Id. (quoting Eichelberger v. Eichelberger, 582 S.W.2d 395, 398-99 (Tex. 1979)); see also
Public Utility Comm'n of Texas v. Cofer, 754 S.W.2d 121, 124 (Tex. 1988). 

 We review a trial court's imposition of sanctions for an abuse of discretion. American
Flood Research, Inc. v. Jones, 192 S.W.3d 581, 583 (Tex. 2006); Cire v. Cummings, 134
S.W.3d 835, 838 (Tex. 2004). A ruling imposing sanctions will be reversed only if the trial
court "acted without reference to any guiding rules and principles." Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241 (Tex. 1985). In determining whether an abuse of
discretion has occurred, the appellate court must ensure that the sanctions were appropriate
or just. See American Flood Research, 192 S.W.3d at 583 (citing TransAmerican Nat. Gas
Corp. v. Powell, 811 S.W.2d 913, 916 (Tex. 1991)). This requires reviewing courts to
conduct a two-part inquiry: 1) the reviewing court must ensure that there is a direct
relationship between the improper conduct and the sanction imposed (whether punishment
was imposed upon the true offender -- the party, its counsel, or both -- and tailored to remedy
any prejudice the sanctioned conduct caused); and 2) the reviewing court must make certain
that less severe sanctions would not have been sufficient to promote compliance. See
American Flood Research, 192 S.W.3d at 583 (citing Powell, 811 S.W.2d at 917). 

 Navarro's argument is inapposite to the standards for reviewing the imposition of
sanctions set out immediately above. Additionally, a trial court's "core functions" have been
found to include "the management of its docket and the issuance and enforcement of its
orders." See In the Interest of K.A.R., 171 S.W.3d 705, 715 (Tex. App.--Houston [14th Dist.]
2005, no pet.). We are directed by the Texas Supreme Court to independently review the
entire record so as to ensure the sanctions imposed "were appropriate or just." American
Flood Research, 192 S.W.3d at 583. Therefore, the fact that sanctionable conduct does not
bear the label, either individually or collectively, of having "interfered with the core
functions of the trial court," does not indicate an abuse of discretion so long as the record
indicates a direct relationship between the improper conduct and the sanction imposed, and
that a lesser sanction would have been insufficient to serve its punitive function. We
therefore overrule Ms. Navarro's fourth issue. 

 We also overrule the first part of issue five which complains that the sanctions order
does not conform to the motion for sanctions. We have previously held an appellant may not
complain that the judgment does not conform to the pleadings if raised for the first time on
appeal. See A.V.A. Servs., Inc. v. Parts Indus. Corp., 949 S.W.2d 852, 854 (Tex. App.--Beaumont 1997, no pet.). This is especially the case when only a partial reporter's record
is filed by the appellant because the reviewing court cannot determine if the appellant
secured a ruling on the issue at trial. See Birnbaum v. Law Offices of G. David Westfall,
P.C., 120 S.W.3d 470, 473 (Tex. App.--Dallas 2003, pet. denied) (citing A.V.A. Servs., Inc.
v. Parts Indus. Corp., 949 S.W.2d at 854). As noted above, statements made by the trial
court during the September 8, 2005, hearing on attorney's fees and sanctions indicate the
sanctions issue had been discussed at prior proceedings involving the parties and the trial
court. Additionally, as no motion for new trial was filed by Ms. Navarro, the trial court was
not given the opportunity to rule on either the judgment conformity issue or the post-judgment interest issue. As a portion of issue five has not been properly preserved for
review, it is overruled. See Tex. R. App. P. 33.1(a). 

 We now turn to issues one through three. Ms. Navarro starts by correctly noting the
proper legal standard for reviewing the imposition of sanctions as abuse of discretion, but
then proceeds to address the first three findings of the trial court under a somewhat subjective
legal/factual sufficiency standard. Additionally, while apparently conceding the trial court's
authority to impose sanctions under its inherent powers, Ms. Navarro contends that such
sanctions are limited to only those instances where "bad faith abuse of the judicial process"
is proven. "Bad faith" may indeed be one basis for imposing inherent authority sanctions,
but a survey of pertinent cases demonstrates broader considerations are involved when
reviewing the propriety of sanctions imposed. In Chambers v. NASCO, Inc., the Supreme
Court characterized a court's "inherent authority" in the following terms:

 It has long been understood that "[c]ertain implied powers must necessarily
result to our Courts of justice from the nature of their institution," powers
"which cannot be dispensed with in a Court, because they are necessary to the
exercise of all others.". . . For this reason, "Courts of justice are universally
acknowledged to be vested, by their very creation, with power to impose
silence, respect, and decorum, in their presence, and submission to their lawful
mandates." . . . These powers are "governed not by rule or statute but by the
control necessarily vested in courts to manage their own affairs so as to
achieve the orderly and expeditious disposition of cases." 

 . . . .


 Because of their very potency, inherent powers must be exercised with
restraint and discretion. A primary aspect of that discretion is the ability to
fashion an appropriate sanction for conduct which abuses the judicial process. 
As we recognized in Roadway Express, outright dismissal of a lawsuit, which
we had upheld in Link, is a particularly severe sanction, yet is within the
court's discretion. Consequently, the "less severe sanction" of an assessment
of attorney's fees is undoubtedly within a court's inherent power as well. . . . 
[A] court may assess attorney's fees as a sanction for the "'willful
disobedience of a court order.'" . . . [A] court may assess attorney's fees when
a party has "'acted in bad faith, vexatiously, wantonly, or for oppressive
reasons.'". . . The imposition of sanctions in this instance transcends a court's
equitable power concerning relations between the parties and reaches a court's
inherent power to police itself, thus serving the dual purpose of "vindicat[ing]
judicial authority without resort to the more drastic sanctions available for
contempt of court and mak[ing] the prevailing party whole for expenses caused
by his opponent's obstinacy."


Chambers, 501 U.S. at 43, 45-46 (citations omitted). The Supreme Court in Chambers
upheld sanctions imposed by a federal district court under its inherent powers because of
fraud perpetrated on the court by the defendant and for "bad faith [defendant] displayed
toward both his adversary and the court throughout the course of the litigation." Id. at 54. 
 In In re K.A.R., the court of appeals affirmed the imposition of sanctions for $13,000
in fees and expenses in a modification suit against the petitioner and his trial counsel as the
record supported the trial court's finding of the "unilateral cancellation of a court-ordered
mediation without adequate notice" by petitioner and his counsel. See In re K.A.R., 171
S.W.3d at 709, 715. Bad faith played no part in this holding as the appellants did not
challenge the trial court's finding that their conduct constituted bad faith. See id. at 712 n.3. 
Nevertheless, the court of appeals recognized that a trial court's inherent authority included
the power to manage its docket as well as "the issuance and enforcement of its orders." Id.
at 715. In that case, when petitioner's trial counsel decided to cancel the court-ordered
mediation session because the petitioner had informed her over a week earlier that he would
not be there, without then making an attempt to immediately cancel or postpone the
mediation, or timely inform opposing counsel of this development in an attempt to mitigate
their inconvenience and expense, trial counsel "effectively usurped the court's role and
displaced the court as decision maker. By taking it upon herself to countermand that which
the court had ordered, [trial counsel] interfered with a core function of the court." Id. 

 In Roberts v. Rose, 37 S.W.3d 31 (Tex. App.--San Antonio 2000, no pet.), the court
of appeals upheld sanctions imposed only on trial counsel, Roberts, totaling $1,250 for
failure to appear at a scheduled mediation session, and for failure to notify opposing parties
of the intent not to attend mediation or to confirm a possible scheduling conflict. See id. at
33, 35. As in the instant appeal, Roberts raised error by the trial court in imposing sanctions
when there was neither an allegation nor a finding of bad faith as to him individually. Id. at
34. The court of appeals responded that Roberts was not sanctioned for failing to mediate
in good faith, but for failing to appear at the scheduled mediation and for his other omissions. 
Id. Citing to Decker v. Lindsay, 824 S.W.2d 247, 250 (Tex. App.--Houston [1st Dist] 1992,
no writ), the court of appeals noted that while parties cannot be forced to peaceably resolve
their disputes through dispute resolution procedures, "a trial court can compel the parties to
sit down with each other." Id. To further emphasize the breadth of the trial court's inherent
authority to sanction, the court of appeals then cited to Gleason v. Lawson, 850 S.W.2d 714,
717 (Tex. App.--Corpus Christi 1993, no writ), which held that a trial court has authority to
sanction a party for failure to attend a court-ordered settlement conference. Id. 

 The Roberts court also noted with approval the fact that the trial court specifically
engaged in a determination of whether the offensive conduct in question was attributable to
Roberts only, or to the client (Murr) only, or to both. Id. at 34-35. See also Wetherholt v.
Mercado Mexico Café, 844 S.W.2d 806, 808 (Tex. App.--Eastland 1992, no writ). The trial
court attributed the offensive conduct to Roberts only and the court of appeals set out the
supporting evidence in the record as follows: 

 [T]he trial court determined that the attorney, Roberts, was chiefly to blame for
both Murr's having missed the mediation and the following hearing. It was
Roberts's failure to keep in regular contact with his client that led directly to
both of these events. . . . T[he] evidence reflected that Murr was willing and
eager to participate in his own case, if given the opportunity. 


 The only evidence of bad faith is not in Murr's failure to appear at the
mediation or at the subsequent sanctions hearing, but in Roberts's deliberate
acts of bad faith throughout his representation of Murr. Roberts's habitual
failure to keep his client informed during the litigation, ultimately amounting
to a missed mediation session resulting in sanctions against Murr, indicates
bad faith on the part of Roberts, rather than Murr. Because the individual most
responsible for the infraction is to be sanctioned, the trial court's ruling which
only assessed sanctions against Roberts, was not an abuse of discretion and
should be affirmed according to the first prong. Wetherholt, 844 S.W.2d at
808. Similarly, the second prong which mandates that the sanction be fair in
light of the harm done and conducive to effectuating the tripartite goals of
discovery is also met. The sanctions are not outrageously punitive, and will
hopefully prevent Roberts and other attorneys like him from abusing their
positions and their clients' trust. 


Roberts, 37 S.W.3d at 34-35. In further support for upholding the sanctions, the record also
indicated that, in addition to failing to inform his client, Murr, of the court-order mediation,
Roberts, upon discovering his personal schedule conflicted with the mediation time, faxed
a letter to the mediator advising him of the conflict. Id. at 33. Thereafter, Roberts made no
attempt to confirm the scheduled mediation had been postponed, nor did he make any further
attempts to reschedule the mediation session. Id. No abuse of discretion by the trial court
in Roberts was shown.

 Also instructive is the rationale given by the court of appeals in upholding sanctions
against a defendant-insurance carrier in light of evidence of its serious pretrial misconduct
in Kings Park Apartments, Limited v. National Union Fire Insurance Company of Pittsburgh,
Pennsylvania, 101 S.W.3d 525, 539-42 (Tex. App.--Houston [1st Dist.] 2003, pet. denied)
(discovery abuse included, inter alia, paralegal instructed by National Union and its attorneys
to steal documents from the chambers of the special trial judge; sanctions included requiring
National Union to pay $25,000 to the Texas Center for Legal Ethics and Professionalism). 
In addressing King Park's appellate complaint that the sanctions were "toothless, and largely
symbolic," the court of appeals stated:

 [T]he allegation that National Union instructed a paralegal to steal documents
from the chambers of the special trial judge may be viewed as a [sic]
interference with the traditional core functions of the court. Based on this
allegation, therefore, the trial court had the authority to enter sanctions under
its inherent power. . . . 


 Here, the trial court indicated, in relation to its ruling under its inherent
powers, that the circumstances made an award of attorneys fees to Kings Park
unjust. The court specifically stated why it did not award attorney's fees: 
"This has been a very contentious case, and Kings Park's expenditure of
attorney's fees was self-inflicted in an attempt to gain information to use in
other cases." Moreover, the sanctions order stated that the trial court
"considered the offensive conduct and attempted to craft sanctions appropriate
to punish that conduct." We believe that the trial court was in the best position
to do so, especially in light of the fact that many sanctions hearings had been
held. We hold that the trial court did not abuse its discretion in imposing the
sanctions under its inherent power and in denying attorney's fees. 


Id. at 541-42. 

 In the instant case, the conduct of Ms. Navarro under scrutiny dated from early
January of 2005, up to the day of trial in early May of 2005. Sworn testimony indicated that
on January 6, 2005, while present along with Ms. Dale at the Dispute Resolution Office
(DRO) after being ordered to mediate, Ms. Navarro, upon checking her electronic
calendaring device, agreed to a mediation session on January 12, 2005. At that time, Ms.
Navarro did not advise Ms. Dale or the trial court that she was set to begin a criminal jury
trial in Harris County the following day, January 7, 2005. In addition to mediation, the
parties were also scheduled on January 12 for a docket call at which time certain pretrial
discovery was to have been exchanged as the jury trial was to have commenced on January
18, 2005. 

 Although Ms. Navarro assumed her criminal jury trial would be finished well before
the January 12 mediation/docket call date, jury selection actually began on January 10, and
Ms. Navarro had no explanation why she waited until January 11 to initially inform Ms. Dale
of these events and orally request a continuance, which Ms. Dale refused. Ms. Navarro
admitted that she was one of two attorneys appearing for the defense in the criminal trial, but
she was somewhat unclear as to which attorney was lead-counsel for the criminal defendant. 
It was only during jury deliberations in the criminal trial that Ms. Navarro first telephoned,
then faxed, her motion for continuance to the trial court. Although Ms. Navarro's motion for
continuance was denied by the trial court, she participated in the docket call proceeding via
telephone. Her absence led to the late exchange of certain discovery documents (January 14),
while other discovery was not provided to Ms. Dale until the day before trial was to begin. 
 On the day of trial, January 18, 2005, Ms. Navarro again failed to appear, and again
failed to timely notify Ms. Dale. Ms. Navarro apparently left a "message" by telephone with
the trial court that her father was seriously ill in Mexico and that she would not be appearing
for trial. A non-lawyer in Ms. Navarro's office apparently was present on January 18 when
rescheduling of the jury trial was discussed with the trial court and Ms. Dale. On January 20,
2005, the trial court faxed a letter to Ms. Navarro's office requesting that she contact the
court to reschedule the trial "[a]s soon as you return[.]" The trial court's letter further
contained the following request: "I think it appropriate for you to supply the court with
documentation to support your absence from Trial, for the record." 

 The first contact Ms. Navarro had with the trial court following the trial date was by
way of a letter her office faxed to the court along with Ms. Navarro's affidavit, which she
intended to serve as proof of her "emergency" as requested by the court. The pertinent
portion of her affidavit reads as follows: 

 On Tuesday, January 18, 2005, I was informed that my father was
critically ill. My father currently resides in Nueva Ciudad Guerrero,
Tamaulipas, Mexico. I had to leave the country immediately in order to be
with my father and was unable to be present on the trial date for the Gaeta
matter. As an officer of the court, I am submitting this affidavit in response
to the court's request for documentation to support my absence from trial. 
Because of the highly personal nature relating to my father's illness, I sincerely
hope this affidavit suffices to support the proof of emergency. 


 Ms. Navarro supplied the trial court with copies of documents from Mexico related
to her father's medical condition as well as a copy of her credit card account indicating
charges for the dates in question and a copy of a prepaid phone card used by Ms. Navarro
while in Mexico. Although Ms. Navarro failed to submit the medical documents with
English translation, Ms. Dale had them translated. These documents raised further
controversy as they appeared to indicate that Ms. Navarro's father's medical condition
manifested itself much earlier than January 17, and indeed appeared to have subsided by
January 18. During the colloquy between the parties and the trial court Ms. Navarro
attempted to place her exhibits in their proper context, viz: 

 MS. NAVARRO: Well, Judge, I'm saying -- I wanted to make sure that
the Judge -- the Court understood that my dad was hospitalized on the 14th,
released on the 15th. He went to the doctor on the 16th again in Zacatecas and
he was released on the 16th. 


 THE COURT: Okay. Tell me that chronology again.


 MS. NAVARRO: He was hospitalized on the 14th and then he was
released on the 15th around 2:00 o'clock. He was still in Zacatecas on the
16th when he -- again was seen by a doctor. And on that day he was kept
under observation for 24 hours so he was actually released on the 17th. 


 THE COURT: From where?


 MS. NAVARRO: From the doctor in Zacatecas.


 THE COURT: Okay.


 MS. NAVARRO: He returned back to his home town because he
wanted to be at his home whenever he thought he was going to pass away. 
That's where he wanted to be in his home with his family. So he arrived back
at the house around 7 -- the 17th and that's when the family was notified that
we had to be over there because he was very ill and we thought -- they thought
he was not going to make it. So that's when my brother came to my house, let
me know that my dad was ill which was in the early hours on the 18th or late
on the 17th and that's when I headed over there, Judge. So I just want to make
sure that -- that the Court understands he was not there in his home town when
all of this happened so we could not -- we did not know what was going on in
this time period. 


 MS. DALE: Your brother didn't go, did he?


 . . . .


 MS. NAVARRO: I didn't say he [Navarro's brother] didn't leave on
the 18th. He left that day because we met -- we -- all the family met together
at my father's house.


 THE COURT: Okay. What documentation do we have to that effect
about the -- your father's chronology?


 MS. NAVARRO: Well, Judge, her translations of the documents are
the only ones -- the only translations. But the Spanish documents are attached
to the response - 


 THE COURT: Okay.


 MS. NAVARRO: -- as an exhibit. 


 . . . .


 MS. NAVARRO: I am not denying I went to Zapata, Judge. That's
where the majority of my family lives. It is 20 minutes away from where my
father lives in Mexico. You just have to cross the border to get to the other
side and the town is right across from there. When I went over there our
family was leaving, coming, just as he was starting to get better or just visiting
with him. So, yes, I went back with my family to Zapata. I am not denying
that. I took money out. I needed cash. I went to the ATM and that shows that
I took money out. 


 . . . .


 MS. DALE: You visited a friend. Sorry. You stayed at a hotel. The
hotel is on the pulse card receipt on the 24th or 25th. 


 THE COURT: 25th.


 MS. DALE: There you have it, you were -- so all of this time we
certainly didn't get a call from Ms. Navarro.


 MS. NAVARRO: Judge, when -- y'all had that court hearing on the
18th when I was gone and Valerie participated. That's my assistant. She told
me that Ms. Dale had requested that we start the following week and that you
had said is (sic) there was another jury trial already scheduled for that week so
my understanding was that we were not going to start the following week.


As a final evidentiary note, the record indicates that pretrial scheduling orders were issued
as early as September 26, 2004, and the following order appearing in bold print directly
under date for the January 12, 2005, docket call: "Appearance at Docket Call is Mandatory! 
Any party that fails to appear at Docket Call will be subject to appropriate sanctions which
may include striking of pleadings and/or the exclusion of some or all of that party's
evidence." 

 We have independently reviewed the entire record presented by the parties. American
Flood Research, 192 S.W.3d at 583. On this record we cannot say the trial court abused its
discretion in imposing sanctions against M. Elena Navarro. The credibility of the testimony
and the amount of weight to be given any particular item of evidence was for the trial court
alone. The trial court had inherent power to aid it in the preservation of its independence and
integrity. In re Bennett, 960 S.W.2d at 40; Eichelberger, 582 S.W.2d at 398. In the instant
case, the trial court was confronted with several instances of conduct on the part of Ms.
Navarro during the course of the underlying modification litigation that, when taken together,
could be found to have significantly interfered with the court's management of its docket as
well as the issuance and enforcement of its orders. See In re K.A.R., 171 S.W.3d at 715. We
echo the sentiments of the court of appeals in Kings Park Apartments in that the trial court
was in the best position to consider the offensive conduct in question and to craft sanctions
appropriate to punish that conduct. See Kings Park Apartments, 101 S.W.3d at 542. The
$5,000 sanction imposed against Ms. Navarro alone is not excessive under the record
presented. Moreover, the sanction punishes the "true offender" while a lesser amount would
have lacked the measure of punishment intended by the court. See American Flood
Research, 192 S.W.3d at 583. Issues one, two, and three are overruled.

 Lastly, the second part of Ms. Navarro's fifth issue complains the trial court erred in
awarding post-judgment interest of 10% on the sanctions amount. She points out that the
finance code limits interest rates under a general money judgment to not more than 5%. See
Tex. Fin. Code Ann. § 304.003 (Vernon 2006). However, Ms. Navarro was required to
present this complaint to the trial court prior to raising it as an appellate issue. See Tex. R.
App. P. 33.1; Goodson v. Castellanos, 214 S.W.3d 741, 760 (Tex. App.--Austin 2007, pet.
filed); Wohlfahrt v. Holloway, 172 S.W.3d 630, 639-40 (Tex. App.--Houston [14th Dist.]
2005, pet. denied), cert. denied, 127 S.Ct. 666 (2006). Our review of the record fails to turn
up any complaint by Ms. Navarro to the trial court as to its calculation of post-judgment
interest on the sanctions amount. Therefore, this particular complaint under Ms. Navarro's
fifth issue has not been preserved for appellate review and is overruled. 

 We dismiss appellant Constantino Gaeta's appeal for want of prosecution. And, as
we have overruled each of appellant M. Elena Navarro's issues regarding the sanctions
imposed on her, we affirm the trial court's judgment in all respects. 

 AFFIRMED.


 __________________________________

 CHARLES KREGER

 Justice


Submitted on November 16, 2006

Opinion Delivered July 12, 2007


Before McKeithen, C.J., Gaultney and Kreger, JJ.
1. Recall that the sanctions order was signed the day after the order disposing of the
attorney's fees issue.